IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AARON J. BUCK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 12 C 5236 |
| vs. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[2]

Aaron J. Buck has filed a motion seeking reversal and remand of a determination by the Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying his Disability Insurance Benefits ("DIB") (doc. # 13). The Commissioner opposes the motion and seeks affirmance of the decision denying benefits (doc. # 23). For the following reasons, the Court grants Mr. Buck's motion and denies the Commissioner's motion to affirm.

### I.

We begin with the procedural history. On September 13, 2010, Mr. Buck filed an application for DIB, alleging a disability onset date of April 1, 2010 (R.134-44). His claim was denied initially and upon reconsideration (R. 68-69, 74-78, 80-83). Mr. Buck requested a hearing, which was held before an Administrative Law Judge ("ALJ") on December 14, 2011 (R. 39-67). On December 27, 2011, the ALJ concluded that Mr. Buck was not disabled and denied

---

[1], Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security, Carolyn W. Colvin, for Michael J. Astrue as the named defendant.

[2]On October 10, 2012, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (docs. ## 10, 11).

his benefits (R. 20-33). The Appeals Council denied Mr. Buck's request for review (R. 1-3), making the ALJ's ruling the final decision of the Commissioner. *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We continue with a summary of the administrative record. In Part A, we review the general background and the medical record; in Part B, the hearing testimony of Mr. Buck and the vocational expert; and in Part C, the ALJ's decision.

## A.

Mr. Buck was born on July 4, 1977 (R. 121). He completed eleventh grade and earned a phlebotomy certification in December 2006 (R. 174). He currently lives with his wife, son, and daughter (R. 46-47). His most recent work experience includes over two years as a general manager at a retail store from 2007 to 2010 (R. 174). Mr. Buck stopped working on April 1, 2010 due to a torn rotator cuff, a torn muscle, an unknown lump on his chest, high cholesterol, high blood pressure, and his ribs not healing after a mass had been removed from his lung (R. 173).

In 2004, Mr. Buck tore his left rotator cuff while moving tables at a school where he was working as a janitor (R. 438, 174). He was treated for six years for the rotator cuff tear and had injections at one time (R. 438). On March 26, 2010, Mr. Buck went to the Emergency Department at Advocate Christ Medical Center in Oak Lawn, Illinois, complaining of increasing pain in his left shoulder (R. 461). X-rays showed no fractures or dislocations, and Mr. Buck was given Dilaudid for pain and discharged with pain medication and muscle relaxers, as well as an arm sling for support (*Id.*). In April 2010 an extensive outpatient workup, which included a

chest CT scan, noted that he had a speculated mass in his lungs with other lesions, and thoracic outlet syndrome with nerve compression (R. 519, 438, 485). On April 13, 2010, an MRI of Mr. Buck's left shoulder showed a small undersurface tear and an os acromiale[3] (R. 877-78). After the chest CT scan revealed a mass in Mr. Buck's left lung, he was referred to Paul J. Gordon, M.D., a thoracic surgeon, who ordered an outpatient PET CT on May 5, 2010 (R. 520-21). Mr. Buck had to pay $2000 for the PET CT because of his poor health insurance (R. 438).

On May 5, 2010, Mr. Buck was admitted to Advocate Christ Medical Center complaining of severe pain in his left shoulder, which was unrelenting despite doses of Flexeril, Tramadol, and Motrin (R. 438). At the hospital, Dr. Jack Roberts examined Mr. Buck, noting that Mr. Buck's chief complaint was pain in his left shoulder and that Mr. Buck had a history of migraines and was experiencing new headaches on the right side of his head (R. 532). Dr. Roberts observed tenderness over the left sternoclavicular joint and laterally over the left anterior chest wall, and in reviewing the CT scan noted a "[p]robable tumor of the apex of the left lung with chest wall invasion (R. 533). These treatment notes reflect that Mr. Buck was to have a biopsy of the tumor, as well as an MRI of his head (*Id.*). While in the hospital, Mr. Buck underwent the needle biopsy on May 7, 2010 (R. 438). That same day, Dr. Francis Jamilla reported that pulmonary function testing revealed essentially normal pulmonary function (R. 451).

On May 9, 2010, Dr. Gary A. Steinecker, a pulmonologist, examined Mr. Buck for an oncology evaluation (R. 438-40). Dr. Steinecker observed that Mr. Buck had pain when moving his left arm and shoulder and noted "quite a bit of tenderness" in the left supraclavicular fossa

---

[3] An "os acromiale" is an acromion (the lateral extension of the spine of the scapula, forming the highest point of the shoulder) that is joined to the scapula by fibrous rather than bony union. MEDILEXICON, http://www.medil)xicon.com/medicaldictionary.php (last visited Jan. 6, 2014).

(R. 439). Dr. Steinecker opined that Mr. Buck had a locally advanced tumor invading the chest wall with intractable pain, which was "probable of brachial plexus involvement, or at least intercostal nerve involvement" and recommended better pain control and social service intervention to help address Mr. Buck's problems with his health insurance, which would not cover any outpatient testing (R. 440). Dr. Steinecker noted in taking Mr. Buck's social history that Mr. Buck "uses marijuana, but denies alcohol intake" (R. 439).

On May 10, 2010, the results of the needle biopsy showed that there was "no definitive evidence of malignancy," but showed "[a]typical chronic pneumonitis" (R. 268). A few days later, on May 13, 2010, Dr. Gordon performed surgery to remove masses and adhesions in the lower lobe of Mr. Buck's left lung (R. 315-16). The pathology report on the masses removed from Mr. Buck's lung found the tissue "negative for carcinoma" but displaying "[a]cute and organizing bronchopneumonia with associated interstitial pneumonitis and fibrosis" (R. 491). Mr. Buck was released from the hospital on May 21, 2010 (R. 434).

On June 2, 2010, Dr. Gordon had a post-surgical follow-up with Mr. Buck and wrote that he was "recovering nicely" (R. 314). With the pain in his arm resolved and only mild incisional pain, his "pain control [was] greatly improved" (*Id.*). On June 20, 2010, Mr. Buck returned to the Emergency Department at Advocate Christ Medical Center, with vomiting and left chest pain over his thoracotomy scar (R. 411). X-rays of the chest showed that his heart was enlarged and that the "region lateral to the probable scarring on the left lower lobe could represent a chronic small pneumothorax" (R. 338, 419). The CT of the chest, however, suggested "[n]o pneumothorax" (R. 337, 420). Mr. Buck was discharged with pain medications and instructed to follow up with his primary care physician (R. 421, 424). On July 7, 2010, in a follow-up

4

examination with his surgeon Dr. Gordon, Mr. Buck reported intermittent chest discomfort (R. 294). Dr. Gordon referred Mr. Buck to a pain management clinic (*Id.*).

On July 12, 2010, Mr. Buck met with Dr. Jonathan Wyatt, a pain management specialist, who noted upon examination that Mr. Buck was in no acute distress but had tenderness to palpation over the area of his surgery scar and diminished sensation to cold along the left side of his chest (R. 283). Dr. Wyatt diagnosed Mr. Buck with "left post thoracotomy syndrome" (*Id.*). Dr. Wyatt further noted that Mr. Buck's pain seemed to be localized in the anterior and mid axillary line of the left chest wall and the skin overlying the scar, as well as in the area of the well-healed scar (*Id.*). Mr. Buck described his pain as "throbbing, pulling, cramping, aching," and that it was worse with "coughing, sneezing, walking, standing, and deep inspiration" (*Id.*). Dr. Wyatt noted that although Mr. Buck was taking one to two 50 mg Tramadol tablets every six hour, he was obtaining only mild pain relief (*Id.*). Dr. Wyatt recommended Mobic, Elavil, and Neurontin to alleviate sleep disturbance and pain, as well as a TENS[4] unit for musculoskeletal pain, and noted that Mr. Buck did not currently wish to undergo any thoracic epidural steroid injections (*Id.*). On July 13, 2010, Mr. Buck saw his primary care physician, Dr. Raymond Weiss, for a follow-up and Dr. Weiss noted that Mr. Buck's left chest was tender, and though Mr. Buck had seen Dr. Gordon and gone to a pain clinic, there was "no clear" diagnosis (R. 290).

On July 30, 2010, Mr. Buck returned to the emergency room at Advocate Christ Medical Center, complaining of upper left chest and shoulder pain (R. 394, 401). A chest x-ray and CT scan showed normal heart size and no indication of central pulmonary emboli (R. 295, 408-09). Mr. Buck was treated with Valium and Dilaudid for pain, discharged with prescriptions for

---

[4] "TENS stands for 'transcutaneous electrical nerve stimulation.' A TENS unit provides nerve stimulation intended to reduce pain." *Bates v. Colvin*, 736 F.3d 1093, 1096 n.2 (7th Cir. 2013).

Valium and Norco, and told to follow up with his primary care physician and Dr. Gordon, as needed (R. 402).

On September 7, 2010, Mr. Buck complained to Dr. Weiss of a pain from a mass on his chest (R.289), but a September 9, 2010 ultrasound did not reveal a definite mass in Mr. Buck's upper abdomen and sternal region (R. 868). And on September 15, 2010, Dr. Gordon found no palpable defect and a CT scan did not show a significant abnormality (R. 299, 335). On October 5, 2010, Mr. Buck went to the Advocate Christ Medical Center Emergency Department complaining of a painful lump on his lower sternum and difficulty breathing, and stating that he had coughed up blood two days earlier (R. 385). Another chest CT was taken, which showed a "stable postoperative chest" (R. 393). Mr. Buck was given Dilaudid to relieve his pain and was discharged with a prescription for a Lidoderm patch (R. 386, 391, 97). On October 27, 2010, Mr. Buck returned to the emergency room for his persistent pain (R. 376). Mr. Buck explained that he had suffered persistent pain since his thoracotomy and that he was taking high doses of Dilaudid and steroids (*Id.*). A chest CT scan and x-ray showed an "unremarkable" chest and "[n]o definite acute pulmonary process" (R. 377. 379), but Mr. Buck described his pain as "excruciating," and requested "liquid" Dilaudid for pain relief because "pills don't work," and further requested that the Dilaudid be given "undiluted" (R. 380-81). He was discharged with instructions to follow up with his doctors (R. 382).

In November 2010, in response to Mr. Buck's continuing complaints of chest pain, Dr. Weiss ordered a cardiac stress test, which showed "normal functional capacity" (R. 467-69). Later in November, Dr. Steinecker referred Mr. Buck to Dr. Rodney Tehrani, a rheumatologist, who determined that a rheumatologic cause for his pain was unlikely (R. 485). In December

2010, Dr. Steinecker ordered a radionuclide bone scan, which showed "[a]bnormal activity in the first rib anteriorly and in the manubrium" (R. 514).

On January 5, 2011, Dr. Gordon reported that Mr. Buck was going to be seen at Rush University Medical Center for "continued discomfort and fullness in his chest" (R. 535). On January 17, 2011, Dr. William Warren, a thoracic surgeon at Rush, saw Mr. Buck and wrote to Dr. Gordon that "for reasons which are not yet clear to me, Mr. Buck claims to have been diagnosed with BOOP[5] and has been treated with high dose steroids, and now chemotherapy" (R. 843). In addition, Dr. Warren observed that although Mr. Buck "has developed, according to clinical reports, nuclear bone scan and CT scan, left shoulder pain, possibly related to the costocondral junction of the left 1st rib or the left sternoclavicular joint[,] I am currently at a loss to explain his clinical painful condition, and the pulmonary condition which has led him to be on chronic steroids" (Id.). Consequently, Dr. Warren had asked Mr. Buck to gather further records and return in a week (Id.). In addition, Dr. Warren ordered a chest CT scan on January 19, 2011, which showed "[p]ostsurgical changes of left thoracotomy," and "[l]eft lingular pulmonary nodule, which has a benign CT appearance" (R. 790). Dr. Weiss's January 21, 2011 treatment notes reflect that Mr. Buck complained of left side pain, head buzzing, hot flashes, and shortness of breath (R. 793). On January 21, 2011, Dr. Weiss ordered a radionuclide perfusion and ventilation lung scan, which showed a "[l]ow probability of pulmonary embolic disease" (R. 861). On January 25, 2011, Dr. Steinecker responded to Dr. Warren's letter, reviewing Mr.

---

[5] "Bronchiolitis obliterans with organizing pneumonia (BOOP) is a rare lung condition in which the small airways (bronchioles) and air exchange sac (alveoli) become inflamed with connective tissue. This is an uncommon illness occurring in one study in 6 out of 100, 000 hospitalizations. It usually starts with a flu-like illness associated with fever, malaise, fatigue and cough. The cough may be persistent and troubling. There is shortness of breath with exertion and weight loss occurs in about half of patients." *Bronchiolitis Obliterans Organizing Pneumonia (BOOP)*, American Lung Association, http://www.lung.org/lung-disease/bronchiolitis-obliterans-organizing-pneumonia/ (last visited January 7, 2014).

Buck's medical history and reporting that after his surgery, Mr. Buck continued to suffer intractable pain, which was not relieved by opioids, a visit to the pain clinic, or antidepressants with neuroleptics (R. 848). In addition, Dr. Steinecker, pursuing "possible treatment for an immunologic problem possibly related to cryptogenic organizing pneumonia" also tried a short course of high dose steroids and a short course of a low dose oral chemotherapy drug, both with no success (*Id.*). Dr. Steinecker also related that a referral to the rheumatology clinic had also not yielded a diagnosis and that he hoped Dr. Warren would be able to "shed some light on his current problem (*Id.*). Dr. Steinecker stated that continued "surveillance for an occult malignancy or other immunologic disease is warranted" and that he was considering a bone biopsy of the left first rib (R. 849). On January 28, 2011, Dr. Kurt Erickson, a cardiologist at Heart Care Centers of Illinois, saw Mr. Buck regarding his chronically high blood pressure and prescribed a clonidine patch to help with his nausea and hypertension (R. 845).

On February 28, 2011, Dr. M. S. Patil, a state agency medical consultant, conducted a consultative examination of Mr. Buck for the Bureau of Disability Determination Services (R. 541). Dr. Patil noted that Mr. Buck was not in any acute distress, had no deformity of the thorax, had normal breath sounds, had no difficulty with tested fine and gross manipulative movements, had "[m]inimal tenderness" over the lower part of his sternum, and had no tenderness or swelling in any joint (R. 542-44). Dr. Patil also observed, however, that Mr. Buck was limited in his range of shoulder motions (R. 543), and that Mr. Buck complained of having a "lump at the bottom of my sternum" that "hurts very badly" whenever he stretched his arms, bent, or lifted anything heavy (R. 541). Mr. Buck reported that his pain was moderately severe and that he was taking Dilaudid every six hours for pain (*Id.*). Dr. Patil also reported Mr. Buck's history of chronic hypertension and moderate obesity (R. 544).

8

On March 14, 2011, Charles Wabner, M.D., a state agency physician, reviewed Mr. Buck's medical record in connection with his social security application (R. 545-52). Dr. Wabner found Mr. Buck partially credible, but found that the medical record did not support the extent of the pain Mr. Buck alleges (R. 552). Dr. Wabner opined that Mr. Buck could occasionally lift and/or carry up to 20 pounds; frequently lift and/or carry up to 10 pounds; stand and/or walk for a total of six hours in an 8-hour workday; sit for a total of six hours in an 8-hour workday; with unlimited ability to push and pull; never climb ladders, ropes, or scaffolds; occasionally reach in all directions, and never be exposed to fumes, odors, dusts, gases, and poor ventilation (R. 546-49). On May 26, 2011, Vidya Madala, M.D., another state agency physician, reviewed the medical record and affirmed Dr. Wabner's assessment (R. 582-85).

In March 2011, Mr. Buck's wife called Dr. Gordon's office requesting a prescription for Dilaudid, but there was no record that Dr. Gordon had ever prescribed Dilaudid (R. 569). A few days later, Mr. Buck then met with Dr. Gordon, complaining of pain, and Dr. Gordon prescribed Norco and referred him to a pain clinic (R. 566-67). On March 30, 2011, Mr. Buck went to the emergency room again with major pain in his lower front and back right side (R. 565). A CT scan showed pneumonia in his left lung (*Id.*). On April 6, 2011, Dr. Gordon again saw Mr. Buck and wrote to Dr. Weiss that Mr. Buck was "doing well" (R. 570).

On May 3, 2011, Mr. Buck again met with pain specialist Dr. Wyatt (R. 576). Mr. Buck reported that since his surgery, he had suffered severe, dull, and aching pain and that he had electric shock sensations along the left side of his thoracic spine (*Id.*). Upon examination, Dr. Wyatt noted chest tenderness with palpation (*Id.*). Dr. Wyatt recommended Vicoprofen, Amitriptyline, and physical therapy with a TENS unit and ultrasound treatment (*Id.*). They also

discussed the risks and benefits of epidural steroid injections, and Mr. Buck elected to proceed with an injection at the next appointment (R. 576-77).

On June 18, 2011, Mr. Buck was hospitalized at Metro South Medical Center in Blue Island, Illinois, for approximately 10 days for chest pain, where he was treated by Dr. Ashok Dholakia (R. 885). A CT scan, an ultrasound, and blood tests were normal (*Id.*). An MRI however, revealed that there "may be some lesion in the upper part" of his chest although it was "not very clear" (*Id.*). Dr. Dholakia suggested that Mr. Buck return to the pain management clinic and try the local steroid injections (*Id.*). Dr. Dholakia reported Mr. Buck's medications as: "clonidine 0.3, Flexeril 10 mg twice a day, Dilaudid 4 mg every four hours, hydroclorothiazide 25, metoprolol 50, Motrin 800 mg twice a day to three times a day"(*Id.*). On July 18, 2011, Dr. Dholakia saw Mr. Buck for a follow up after his hospitalization. In reviewing Mr. Buck's history, Dr. Dholakia reported that Mr. Buck is "unable to lift any weight or reach any with height. Very short of breath on walking only a very short distance because of the pain, discomfort, throbbing pain in the lower sternal area. . . . The patient is very handicapped with daily living with wife. He can sit for five minutes but having severe pain, cannot walk, must sit for a short . . .duration of time at this point and constantly in pain" (R. 899). Upon examination, Dr. Dholakia noted that "[t]he patient has a lumpy feeling, swelling on the left stellar and lower stellar area, very tender on the left first rib area, sternal joint is tender too but not as much as the lower one" and diagnosed Mr. Buck with chronic pain syndrome "with the sternal area post surgery inflammatory process" (R. 900-01). He concluded that Mr. Buck was "absolutely disabled to work" and recommended that Mr. Buck go to Mayo Clinic (*Id.*).

In a letter to Com Ed on August 16, 2011 seeking to prevent Mr. Buck's electricity from being turned off, Dr. Dholakia wrote that Mr. Buck has been totally disabled for a year by the

combination of Chronic Pain Syndrome, inflammatory process, and hypertension, and that his condition will continue for the rest of his life (R. 897). On August 22, 2011, Dr. Dholakia completed a Physical Residual Functional Capacity Questionnaire form for Mr. Buck (R. 590-92). Dr. Dholakia opined that Mr. Buck had marked tenderness at the left second "costocondral and swelling [of the] lower sternum with marked tenderness and listed the diagnosis as "post-surgical chest pain" (R. 590). He checked boxes indicating that Mr. Buck suffered from depression, somataform disorder, and anxiety (*Id.*). Dr. Dholakia concluded that Mr. Buck: (1) was experiencing pain severe enough to "constantly" interfere with the attention and concentration needed to perform even simple work tasks; (2) could sit or stand up to only 10 minutes at one time before needing to get up; (3) could sit, stand, or walk less than two hours in an eight-hour workday; (3) would need unscheduled breaks during an eight-hour workday; (4) has significant limitations with reaching, handling, or fingering; (5) would likely be absent from work for more than four days a month as a result of impairments or treatments; and (6) is "unable to work" (R. 591-92).

Mr. Buck returned to Dr. Dholakia for a follow up on August 29, 2011 (R. 894-96). At that point, Mr. Buck's medication list included 2 Percocet every four hours, Metoprolol, Motrin three times daily, Clonidine patch, Methadone twice a day, as well as Elavil, which made him "loopy, very sleepy" (R. 894). Dr. Dholakia advised him to "cut down the Elavil, [and] stop the methadone" (*Id.*). The treatment notes reflect "local chest wall tenderness" and list Mr. Buck's Assessment as "1. Chronic pain syndrome. 2. History of asthma. 3. Bronchitis. 4. Hypertension, which is stable" (R. 896). Dr. Dholakia again opined that Mr. Buck is disabled and unable to "lift, push, pull" (*Id.*). Dr. Dholakia's treatment notes on October 19, 2011 state that Mr. Buck came in with left-sided pain and discomfort of 8/10 scale that occurred while he was raking

leaves: "He had some kind of pressure, then suddenly snapped and popping in the left lower chest and left upper quadrant, unable to breathe, shortness of breath" (R. 890). Dr. Dholakia recorded his blood pressure as 170/118 and 240/140 and noted marked tenderness in the "left lower chest wall as well as the upper abdomen" (R. 892). Dr. Dholakia opined Mr. Buck had malignant hypertension and sent him directly to the emergency room for further care and evaluation, as well as a CT scan of his chest, abdomen, and pelvis (*Id.*). On November 7, 2011, Dr. Dholakia noted tenderness in the sternum and left lower rib area as well as some tenderness on the right side on Mr. Buck's first rib, plus severe left side pain (R. 907). Mr. Buck's medications included Percocet and Dilaudid, and Dr. Dholakia reported that Mr. Buck was "narcotic dependent at the present time" (R. 906-08). The treatment notes reflect that Mr. Buck was going to go to the University of Chicago to get retested on his labs and that Dr. Dholakia believes that Mr. Buck has some defect in the area of the first rib, "for which he is going to require aspiration or biopsy at some point" (*Id.*).

On November 11, 2011, a chest CT ordered by Dr. Dholakia showed no evidence of a mass and was unchanged from a prior study in October 2011 (R. 912). The radiologist's report stated that the images of the "sternum anterior ribs are unremarkable," the "anterior chest wall is unremarkable in appearance" and that the etiology for Mr. Buck's pain was not clear from the scan (*Id.*).

## B.

On December 14, 2011, a hearing was held before the ALJ at which Mr. Buck, who was represented by counsel, and a vocational expert ("VE") testified (R. 39-67). Mr. Buck had worked as a custodian at a high school where he had torn his rotator cuff in 2003 (R. 57). He had also worked as a store manager from 2007 through 2010 (*Id.*). Mr. Buck testified that the

last time he worked was April 16, 2010, when doctors discovered a mass growing on his left lung and performed emergency surgery to remove it (*Id.*). Mr. Buck stated that he had seen a lot of doctors seeking a diagnosis for the cause of his pain, but all they said was that there were benign masses in his lungs (R. 44). He also stated that his wife and his current doctor, Dr. Dholakia, think he may have pulmonary hypertension class IV, for which he is planning to get a diagnosis at the University of Chicago (*Id.*).

Mr. Buck testified that he has a son and a daughter, who at that time were seven and six, respectively (R. 46). He tries to go to parent-teacher conferences and attend school activities with them, except when it involves lifting things (*Id.*). He also does the dishes and light cooking when his wife is at work, although he cannot stand for long (R. 47). He stated that cooking is the hardest because he has to constantly get up and down, and he cannot stand in one spot for a long period of time (R. 51). When he does a little bit of cleaning, he has to take up to an hour break after 30 minutes or so (R. 47, 51). He does not do anything involving "heavy stuff," such as vacuuming (R. 51). He has a driver's license with no restrictions, and he drives only "once in a great while" (R. 47). He stated that he has never used street drugs, including marijuana (R. 48).

Mr. Buck testified that during the hearing he was feeling very sore, with pain in his left-side ribs, scar, sternum, left collarbone, and upper chest and difficulty breathing (R. 49, 51). He stated that when he yawns, it feels like his lungs fill up and he gets a shock and that the pain is typically worse than the difficulty in breathing (R. 51). He currently has severe high blood pressure, which the doctors said is affected by his weight, but is primarily caused by the pain (*Id.*). He receives treatment for both pain and high blood pressure (*Id.*). The last time he was hospitalized was about a month ago before the hearing (*Id.*). He was seeing Dr. Dholakia for a routine checkup and within two minutes the doctor sent him to the emergency room because his

blood pressure was "sky-high" (R. 49-50). His level of pain is "always" between 7 to 10 on a ten-point scale, and when it hits 10, he's in the hospital (R. 51-52).

Mr. Buck stated that he was given Dilaudid because it was the strongest medication for pain management, but it made him "like a zombie" (R. 52). Consequently, he was given Percocet since he started pain management in April 2011, which also makes him groggy (*Id.*). He explained that he had to be careful not to pass out with the pain medications because he has to watch his children at night when his wife is at work (*Id.*). He stated that although he has been directed to take two Dilaudid every four hours for severe pain, it is impossible for him to do so, and that instead he takes two pills at least once every other day when in severe pain (R. 52-53). The Percocet and Motrin make him sleepy (*Id.*). The morphine is worse (R. 54). He cannot watch his children after taking these medications (R. 53-54). It takes at least five hours for the grogginess to wear off after taking the Percocet, and at least a day or two for the effects of the morphine to wear off (R. 55).

Mr. Buck explained that he recently began seeing Dr. Dholakia for his primary care because his insurance covered him (R. 45). Dr. Dholakia gave him injections in his spine and ribs and then told him to go to the Mayo Clinic (*Id.*). But he has no money to travel so that's why they decided to try University of Chicago for treatment, although he had not yet scheduled an appointment (*Id.*). He currently does not have a phone because he cannot afford one (R. 48).

The VE testified next. The ALJ first asked about a hypothetical claimant of the same age, education, and experience as Mr. Buck, who has the residual functional capacity ("RFC") to perform light work, could frequently climb ramps and stairs but never ladders, ropes, or scaffolds, could occasionally reach in all directions including overhead with both upper extremities, and would need to avoid concentrated exposure to fumes, odors, dusts, gases, and

14

other pulmonary irritants (R. 59-60). The VE responded that the hypothetical person could perform Mr. Buck's past work as a retail manager, but not as he reported doing it (R. 59). The ALJ then further limited the hypothetical to occasionally climbing ramps and stairs, but never ladders, ropes or scaffolds; could frequently balance, stoop, and kneel, but never crouch or crawl; occasionally reach in all directions with upper extremities; and would need to avoid concentrated exposure to other pulmonary irritants as well as hazards including moving machinery or unprotected heights (*Id.*). The VE opined that the hypothetical person could perform Mr. Buck's past work as a retail manager as it is typically done, but again not as he reported doing it (R. 60).

The ALJ then further limited the hypothetical to only sedentary exertion and included all the other previous limitations (*Id.*). The VE testified that this eliminated all of Mr. Buck's previous employment (*Id.*). However, the hypothetical person could work as a telephone solicitor, for which there are 4,900 Illinois jobs and 187,000 jobs nationally and as a credit checker, for which there are 2,000 Illinois positions and 48,000 nationally (*Id.*). When the ALJ further limited the hypothetical to unskilled work tasks that could be learned by demonstration or in 30 days or less and included all the other previous limitations, the VE opined that there were light-level or sedentary jobs – in addition to the sedentary credit checker positions, there were light work positions as a counter clerk (8,800 in Illinois; 235,000 nationally), a furniture rental consultant (8,800 in Illinois; 235,000 nationally), and an usher (1,400 in Illinois; 30,000 nationally) (R. 60-61). Additional limitations to sitting, standing, or walking for less than two hours in an eight-hour workday or absences of more than four days a month would each eliminate all competitive work (R. 60-62). The VE opined that absences of six to eight days a year would be considered the maximum for competitive work (R. 62).

In response to a question from Mr. Buck's attorney, the VE explained that positions as a credit checker, a telephone solicitor, an usher, and a counter clerk all require the ability to talk two-thirds of all working hours (R. 62-63). The VE explained that in his experience, competitive employment on the unskilled level would not be available to someone who would be off-task more than ten minutes out of each hour (R. 63). The VE also testified that competitive employment on the unskilled level would not be available to someone who would need two extra unscheduled breaks a day, each of ten to fifteen minutes in duration, due to taking medication (R. 64).

## C.

On December 27, 2011, the ALJ issued a written opinion finding Mr. Buck not disabled and denying him benefits (R. 23-33). In evaluating Mr. Buck's claim, the ALJ applied the familiar five-step sequential inquiry for determining disability, which required her to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform her past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

At Step 1, the ALJ found Mr. Buck had not engaged in substantial gainful employment since April 1, 2010 (R. 25). At Step 2, she found that Mr. Buck had severe impairments of "status post surgery to remove lung mass; status post rotator cuff repair; and obesity," but concluded that Mr. Buck's hypertension was non-severe because he had not received significant treatment for the hypertension, which been controlled until very recently (*Id.*).

16

At Step 3, the ALJ ruled that even with consideration given to obesity, there was no evidence to support that Mr. Buck had an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments, including Listings 1.02, 3.02, and 3.03 (R. 26). The ALJ then determined that Mr. Buck had the RFC to "perform light work . . . except he can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; he can frequently balance, stoop and kneel but never crouch and crawl; he can occasionally reach in all directions including overhead with both upper extremities; and he must avoid concentrated exposure to fumes, pulmonary irritants, and hazards such as moving machinery or unprotected heights" (*Id.*).

In determining Mr. Buck's RFC, the ALJ first reviewed Mr. Buck's hearing testimony. Mr. Buck claimed that he is unable to work due to effects of surgery to remove a lung mass, a torn rotator cuff, a torn muscle, a lump on his chest, high cholesterol, and high blood pressure (R. 26). The ALJ also noted that Mr. Buck testified that he has a twisted sternum and pain in his ribs, sternum, and left collarbone (R. 26-27). In addition, he experiences shortness of breath, has high blood pressure, and takes pain medication that makes him sleepy, but does the dishes and light cleaning, such as dusting, and cooks when his wife works (*Id.*).

The ALJ disbelieved Mr. Buck's statements concerning the "the intensity, persistence and limiting effects" of his symptoms because they were not supported "by objective findings consistent with a finding of total disability" (R. 27). The ALJ found that the medical record did not corroborate the extent of his claimed chest pain and shortness of breath. The ALJ cited a number of clinical findings that showed only "some tenderness in the chest area and clear lungs," "repeated testing" that had been negative, and a number of treatment notes reporting that Mr. Buck had been in "no acute distress at the time of the examination" (*Id.*). The ALJ noted that the

17

April 2010 CT scan showed a mass on Mr. Buck's lung, but that pathology reports showed that the tissue was not malignant and the mass was removed in May 2010 (*Id.*).

The ALJ also reviewed medical records that followed Mr. Buck's surgery. When Mr. Buck had complained of "intermittent chest discomfort" shortly after the surgery, his surgeon referred him to a pain specialist, who noted tenderness over the surgical scar, prescribed pain medication, and recommended the use of a TENS unit (*Id.*). The ALJ mentioned Mr. Buck's July 2010 visit to the emergency room, where he was treated with pain medication for his chest pain and released (R. 27-28). In September 2010, though Mr. Buck complained of swelling over his sternum, his doctor "did not find a palpable defect," and a CT scan and an ultrasound also did not reveal a mass or abnormality (R. 28). The ALJ noted that Mr. Buck returned to the emergency room twice in October 2010, complaining of pain in the area of his lower sternum and difficulty breathing (*Id.*). Again, examination showed mild tenderness and no respiratory distress, and Mr. Buck was treated both times with medication and released (*Id.*). A chest CT scan was normal (*Id.*). The ALJ noted additional examinations showing low probability of rheumatological illness or pulmonary embolic disease, as well as a consultative examination showing no acute distress or deformity of the thorax (*Id.*). In April 2011, Mr. Buck's doctor wrote that he was "doing well" and again referred him to a pain specialist, who prescribed medication and physical therapy (*Id.*).

The ALJ discussed Mr. Buck's June 2011 ten-day hospitalization for chest pain, noting that a CT scan, WBC scans, ultrasound, and blood tests were all normal and that after release from the hospital, Mr. Buck continued treatment with Dr. Dholakia, the doctor who treated him in the hospital (R. 28). In July 2011, treatment notes reflected that Mr. Buck's lungs were clear, but that there was swelling and tenderness near his sternum and left first rib, and Dr. Dholokia

18

offered a diagnosis of chronic pain syndrome (*Id.*). The ALJ listed treatment notes from August, October, and November 2011 also showed clear lungs, with the August notes reporting no apparent distress or shortness of breath, the October notes reflecting "no wheezing, no retraction, and normal airway entry," and the November notes showing only mild shortness of breath, with a CT scan at that time showing an "unremarkable" chest wall (R. 29).

Because the ALJ did not find that the medical evidence supported the degree of the limitations that Mr. Buck claimed, she concluded that restricting him to work at light exertional levels with additional limitations would sufficiently accommodate his pain and shortness of breath (R. 29). The ALJ also analyzed the records supporting Mr. Buck's claim of limitations caused by the repair to his torn rotator cuff and determined that limiting him to only occasional reaching in all directions would accommodate his limited range of shoulder motion (*Id.*).

The ALJ proceeded to discuss other factors she considered in assessing Mr. Buck's credibility, including Mr. Buck's activities of daily living, such as light cleaning and raking leaves; noncompliance with treatment, which suggests that his symptoms were not as limiting as alleged; and inconsistent reporting of his drug use – testifying that he had never used marijuana in contrast to treatment notes where he admitted to using marijuana (R. 30).

The ALJ considered and discussed the medical opinion evidence available, giving "great weight" to the state agency medical consultants, upon which the ALJ relied for the RFC determination, and finding their opinions supported by the medical evidence, which "demonstrates minimal clinical findings and generally normal test results" (R. 30). The ALJ gave "little weight" to the opinion of Mr. Buck's most recent treating physician, Dr. Dholakia, who opined that Mr. Buck was limited to less than two hours of sitting, standing, or walking during an eight-hour day, among other extreme limitations, including that Mr. Buck is disabled

(*Id.*). The ALJ explained that she discounted Dr. Dholakia's opinions because the medical evidence, including his own objective findings, did not support them; Dr. Dholakia did not provide specific support regarding Mr. Buck's limitations; and his opinions appeared to be based upon Mr. Buck's subjective complaints, rather than on the objective evidence (*Id.*).

The ALJ also considered and gave "some weight" to statements given by Mr. Buck's wife, mother, and mother-in-law, all reporting that Mr. Buck is in constant pain, sleepy from pain medication, and limited in his daily activities, but concluded that the RFC sufficiently accounted for the limitations to the extent they were supported by the objective record (R. 30-31).

At Step 4, the ALJ found Mr. Buck was able to return to his past work as a retail manager, consistent with the testimony of the VE, and therefore he was not disabled under the Act (R. 31-33). Because the ALJ found at Step 4 that Mr. Buck was not disabled, she did not proceed to Step 5.

## III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). We will not reweigh the evidence or substitute our judgment for that of the ALJ. *Id.* at 362. A decision denying benefits need not address every piece of evidence, but the ALJ must provide "an accurate and logical bridge" between the evidence and her conclusion that a claimant is not disabled. *Kastner*, 697 F.3d at 646.

Mr. Buck asserts that the ALJ erred by not properly assessing Mr. Buck's credibility and failing to give proper weight to the opinion of Mr. Buck's treating physician (doc. # 13: Plaintiff's Memorandum in Support of His Motion to Reverse the Decision of the Commissioner

of Social Security ("Pl.'s Mem.") at 5, 9). Because we find that the ALJ failed to properly analyze Mr. Buck's credibility, we reverse on that ground and remand.

## A.

Mr. Buck contends that the ALJ erred in evaluating his credibility and raises several arguments to support this claim. We find that the ALJ did not adequately consider Mr. Buck's claims of pain, and failed to analyze Mr. Buck's pain medication and its effects.

A reviewing court may overturn a credibility determination if the ALJ fails to justify her conclusions with specific reasons that are supported by the record. *Pepper*, 712 F.3d at 367; *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009). "Pain can be severe to the point of being disabling even though no physical cause can be identified, though in such cases, the claimant's credibility becomes pivotal." *Pierce v. Colvin*, No. 13-1525, 2014 WL 104158, at *3 (7th Cir. Jan. 13, 2014) (citing *Sims v. Barnhart*, 442 F.3d 536, 537–38 (7th Cir. 2006); *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006); *Carradine v. Barnhart*, 360 F.3d 751, 753–54 (7th Cir. 2004)). Thus, to build the required logical bridge for a credibility determination regarding pain, the ALJ must consider not only the objective medical evidence, but also the claimant's daily activities; the duration, frequency, and intensity of pain; any precipitating and aggravating factors; the dosage, effectiveness, and side effects of medication; treatment; and functional restrictions. 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at 3 (July 2, 1996); *see Schomas v. Colvin*, 732 F.3d 702, 708-09 (7th Cir. 2013) ("in making a credibility finding the ALJ must evaluate the claimant's pain level, medication, treatment, daily activities, and limitations"); *Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (requiring analysis of SSR 96-7p factors as part of logical bridge for credibility determination).

Here, in a case involving allegations of extreme, chronic pain, the ALJ relied too heavily on the objective evidence, without sufficiently considering other necessary factors. "An ALJ may not discount a claimant's credibility just because her claims of pain are unsupported by significant physical and diagnostic examination results." *Pierce*, 2014 WL 104158, at *3; *see also* SSR 96–7p ("An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence"); *Bjornson v. Astrue*, 671 F.3d 640, 646 (7th Cir. 2012); *Myles v. Astrue*, 582 F.3d 672, 676–77 (7th Cir. 2009); *Carradine*, 360 F.3d at 753. In *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010), a case where the ALJ had discounted the claimant's allegations of pain because her doctors had failed to identify its cause, the Seventh Circuit explained that "the etiology of extreme pain often is unknown, and so one can't infer from the inability of a person's doctors to determine what is causing her pain that she is faking it." *Id.* at 922 (citations omitted).

The ALJ found Mr. Buck's claimed limitations "not credible to the extent they [were] inconsistent with [his] residual functional capacity assessment," stating his allegations were "not supported by objective findings," and relying on physical examinations that had shown minimal abnormalities, objective testing that had been negative, and treatment notes stating that Mr. Buck had denied any shortness of breath and that he was "in no acute distress" at the time of a number of examinations (R. 27-29). However, this assessment of the evidence did not go far enough. "An ALJ cannot rely only on the evidence that supports her opinion. . . . And while an ALJ need not mention every piece of evidence in her opinion, she cannot ignore a line of evidence that suggests a disability." *Bates*, 736 F.3d at 1099 (citations omitted). The record also contains numerous treatment records – which the ALJ did not address – recounting episodes where Mr.

Buck reported extreme pain, and doctors responded by treating him with strong pain medication. For example, in May 2010, Mr. Buck was admitted to the hospital because of "severe intractable pain" in the left shoulder, which was "unrelenting despite Flexeril, Tramadol, and Motrin" (R. 438). Since then, his surgeon referred Mr. Buck to a pain specialist, Dr. Wyatt (R. 294), who suggested stronger pain management approaches including epidural steroid injections and a TENS unit (R. 576, 283). Moreover, Mr. Buck made many trips to the emergency room after his surgery in May 2010 for pain, and by October 2011, he had visited the emergency room at least five times, including a ten-day hospital stay in June 2011 (R. 394, 385, 380, 565, 885, 890). In addition, tenderness and swelling were also documented in Dr. Dholakia's treatment notes between July and November in 2011 (R. 900, 590, 894, 892, 907), and upon examination by other medical sources, including Dr. Steinecker, Dr. Wyatt, and emergency room doctors in 2010 (R. 283, 385, 439).

Significantly, the ALJ also failed to address why the substance and quantity of the strong narcotic medications and other pain treatments prescribed for Mr. Buck did not substantiate the severity of his pain and the consequent limitations. A review of the record suggests that Mr. Buck's treating sources believed that Mr. Buck was suffering from severe pain. His medical records show that from the beginning of his visits to the hospital, different treating sources repeatedly prescribed or recommended strong pain killers, some even narcotic, including Dilaudid (R. 438, 485, 397, 386, 391, 381, 541, 885, 906), Percocet (R. 890, 906), Tramadol (R. 438, 283, 720), Fentanyl (Duragesic) patches (R. 438, 440), Norco (R. 386, 392), Vicoprofen (R. 576), and epidural steroid injections (R. 576, 283). On October 5, 2010, Dilaudid was ordered at least three times that day in the emergency room (R. 386, 391-92). In July 2011 alone, Mr. Buck's medications included Dilaudid 4 mg every four hours, Motrin 800 mg twice to three

times a day, and Flexeril 10 mg twice a day (R. 885). Further, on May 3, 2011, when Dr. Wyatt suggested epidural steroid injections and discussed the risks of the procedure, including nerve damage, congestive heart failure symptoms, and worsening or no improvement of the pain symptoms, Mr. Buck was given the option of foregoing the procedure (R. 576). (Id.). Despite Dr. Wyatt's warnings, however, Mr. Buck opted to proceed, after he learned there was the possibility of it "perhaps relieving his pain" (R. 576-77).

The ALJ failed to discuss this line of medical evidence that would tend to corroborate the extent of the pain that Mr. Buck claimed to suffer. In finding Mr. Buck's claim of disabling pain lacking in credibility, it was incumbent on the ALJ to explain why this host of treating sources would continue to prescribe such potent pain medications and other treatments if they did not believe Mr. Buck was suffering severe pain. *See Carradine*, 360 F.3d at 755 (discussing improbability that the claimant was a "good enough actress to fool a host of doctors and emergency-room personnel into thinking she suffer[ed] extreme pain" and "prescribe drugs and other treatment for her if they thought she were faking").

Nor did the ALJ analyze the side-effects of Mr. Buck's regimen of heavy-duty pain medications or his activities of daily living. Mr. Buck testified that the Dilaudid made him "like a zombie" and the Percocet caused "complete grogginess" (R. 52). The ALJ's opinion referred to the testimony of Mr. Buck and his wife that Mr. Buck's pain medication "cause[d] sleepiness" (R. 27, 30). However, these brief references did not identify the medications that Mr. Buck took; did not explain whether they would be expected to cause drowsiness; and did not explain to what extent the ALJ found this testimony lacking in credibility, and why. The ALJ's opinion falls short of the requirement that ALJs carefully evaluate evidence bearing on the severity of pain and give specific reasons for discounting a claimant's testimony about it. *See* 20 C.F.R. §

404.1529(c)(3) ("Factors relevant to your symptoms, such as pain, which we will consider include: . . .The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms"); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (finding the ALJ's credibility analysis flawed for failing to discuss evidence favoring claimant, including the fact that claimant was prescribed a number of prescription medications to alleviate pain and depression); *see also Ramey v. Astrue*, 319 F. App'x 426, 429 (7th Cir. 2009) (vacated and remanded where, among other errors, the ALJ never discussed significant side effects of pain medications).

The ALJ also discounted Mr. Buck's statements about his daily activities to the extent she found them inconsistent with the medical evidence, without properly addressing why she found his statements not credible (R. 29). The Seventh Circuit has repeatedly warned against using the claimant's activities of daily living as proof of his ability to perform full-time work. *Hughes v. Astrue*, 705 F.3d 276, 278–79 (7th Cir. 2013); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Mr. Buck's light household duties, interrupted with frequent rest breaks, are not facially inconsistent with his allegations of pain, nor do they establish his ability to work full-time. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("Roddy's inability to get through the day without lying down three to four times for an hour, or to complete even simple chores requiring standing, like cooking, does not indicate an ability to work even a sedentary job full-time"). The ALJ also mistakenly inferred that Mr. Buck was not as limited in his daily activities as he claimed, based on a single treating note stating that he was raking leaves before coming to the hospital (R. 29). However, this note actually showed that Mr. Buck had gone to Dr. Dholakia with pain rated at 8 out of 10, because as he was raking leaves, he felt pressure and something "suddenly snapped, popping" in his chest, so that he was unable to breathe (R. 890). Dr.

Dholakia sent him "directly to the emergency room for further care and evaluation." (R. 892). The ALJ failed to explain why this leaf-raking episode supports the proposition that Mr. Buck is capable of full-time light duty work.

"An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce*, 2014 WL 104158, at *4. Here, Mr. Buck's testimony was not incredible on its face, given the number of treating physicians who took his complaints seriously and prescribed powerful pain medications, and it is not clear that the ALJ would have come to the same conclusion had she properly analyzed Mr. Buck's credibility. Consequently, we reverse and remand.

## B.

In light of our decision to remand, we need not address Mr. Buck's remaining arguments. *Eskew v. Astrue*, 462 Fed. App'x 613, 615 (7th Cir. 2011) (given the court's remand on one of claimant's arguments, it "need not address [her] remaining arguments"); *see Pierce*, 2014 WL 104158, at *5. We note, however, that particularly in a case where the objective record offers little insight into the source of Mr. Buck's chronic pain, on remand the ALJ should consider the proper relative weight to allocate to opinions of treating sources, as opposed to those of medical consultants with more limited knowledge of the claimant.

A treating physician is usually in a better position to assess a claimant's limitations than is a nontreating physician. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances"); *Martinez v. Colvin*, No. 12 C 3888, 2013 WL 6696177, at *7 (N.D. Ill. Dec. 18, 2013) ("A treating physician typically has a better opportunity

to judge a claimant's limitations than a nontreating physician"). Generally, the opinions of treating sources are entitled to greater weight because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).

Thus, on remand, the ALJ should address the factors that would shed light on whether she could properly adopt the opinions of the consultative examiners over the opinion of a treating physician. For example, on one side of the ledger, the ALJ should address the specialties of both the treater and the medical consultants, which is relevant to whether the consultants have a level of relevant expertise that exceeds that of Dr. Dholakia.[6] *See, e.g., Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (per curiam) (the ALJ failed to apply the correct legal standard and support that decision with substantial evidence where "the choice to accept one physician's opinions but not the other's was made by the ALJ without any consideration of the factors outlined in the regulations, such as the differing specialties of the two doctors, [and] the additional diagnostic testing conducted by [the claimant's doctor]"). If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider a checklist of factors— "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion"—to determine what weight to give the opinion. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (quoting *Moss*, 555 F.3d at 561, which was citing 20 C.F.R. §

---

[6] Dr. Dholakia practices internal medicine with Pronger Smith Medical Care, Pronger Smith Medical Care, http://www.prongersmith.com/chicago_doctors/internal_medicine_ashok_dholakia (last visited Jan. 21, 2014). In his brief, Mr. Buck refers to Dr. Dholakia as his "pain management doctor" (Pl.'s Mem. at 5-6), but we do not find support in the record for this characterization of Dr. Dholakia's specialty.

404.1527). The ALJ also should address whether the type of condition (and pain) that Mr. Buck alleges presents a case where a reliable opinion can be rendered based solely on the interpretation of records and without an in-person assessment. *See Suess v. Colvin*, 945 F. Supp. 2d. 920, 934 (N.D. Ill. 2013) ("the physical basis of the disability in this case is fibromyalgia, dizziness, headaches, and back ache. Such conditions are not measured by x-rays and laboratories"); *Allen v. Colvin*, 942 F. Supp. 2d 814, 825 (N.D. Ill. 2013) ("An ALJ may reject the opinion of a treating physician in favor of the opinion of a nontreating physician where the nontreating physician has special, pertinent expertise and where the issue is one of interpretation of records or results rather than one of judgment based on observations over a period of time"); *cf. Peabody Coal Co. v. Helms*, 901 F.2d 571, 573 (7th Cir. 1990) (black lung case: "If the treating physician is not a specialist in black lung disease but the consultant is, and if a judgment of disability depends to a great extent on the expert interpretation of documentary data, such as X-rays and the results of gas and ventilatory tests, then reason may require that the consultant's opinion be given equal or even greater weight than the treating physician's").

On the other side of the ledger, while Dr. Dholakia was a treating physician, he had held that role for only one month at the time he offered his July 2011 opinion that Mr. Buck suffered from extreme pain and had severe limitations. The ALJ may consider whether that length of time as a treating physician provided Dr. Dholakia with a sufficient basis for his opinion (and, if not, why not). In addition, the ALJ may take into account the efforts of Dr. Dholakia in the following month, August 2011, to intervene with Commonwealth Edison to assist Mr. Buck in attempting to retain his electrical service, as those efforts might bear on Dr. Dholakia's objectivity in his evaluation of Mr. Buck. The ALJ should consider these matters on remand in deciding the weight she grants Dr. Dholakia's opinion.

In making these observations, we do not seek to dictate to the ALJ what her determination must be on remand with respect to the weight she accords to Dr. Dholakia's opinions. We simply note that when an ALJ elects to discount the opinion of a treating physician, she must offer "good reasons" for doing so. *E.g., Bates*, 736 F.3d at 1101. Moreover, the ALJ will be free to obtain further evidence to supplement the medical record to the extent she deems it appropriate. *See id.* Our discussion here is intended to offer guidance to the ALJ with respect to the type of analysis she must undertake if she chooses to accord a treating physician's opinion little or no weight.

## CONCLUSION

For the reasons set forth above, we grant Mr. Buck's motion for remand (doc. # 13), and we deny the Commissioner's motion to affirm (doc. # 23). The case is remanded for further proceedings consistent with this ruling. The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

**DATED: January 27, 2014**